## TILLIE WESSEL, Appellant, v. C. L. LAVENDER.

Division One, December 2, 1914.

1. PLEADING: Proof: Surplusage. Proof is required of those allegations only that are necessary to a recovery, and those unnecessary to that end may be eliminated as surplusage.

2. ――――: ――――: ――――: Action for Ravishing Unconscious Female: Cause of Unconscious State: Not an Issue: Instructions. Where the petition in an action for damages for ravishment alleged that the defendant, a physician, administered medicine to the plaintiff while she was sick in bed, and she having become unconscious under the influence of the medicine, the defendant had sexual intercourse with her, the cause of the plaintiff's unconsciousness was not an issue, and the giving of an instruction requiring a finding that it resulted from the medicine was reversible error.

3. ACTION FOR RAVISHMENT: Female's After-agreement to Keep Silent: Her Testimony. Where there is reversible error in an instruction, a verdict for the defendant in an action for damages for ravishment will not be affirmed on the ground that the testimony of the plaintiff, who had agreed to keep silent in consideration of a payment to be made to her by the defendant, was unworthy of belief.

Appeal from Warren Circuit Court.—*Hon. James D. Barnett,* Judge.

REVERSED AND REMANDED.

*John W. Booth, Jesse H. Schaper* and *J. W. Delventhal* for appellant.

*T. W. Hukriede* and *Morton Jourdan* for respondent.

BROWN, C.—This is an action by plaintiff for five thousand dollars actual damages and five thousand dollars punitive damages for ravishing her on April 16, 1908, while she was unconscious. She was, at the time of the injury complained of, married, about thirty years old, and lived with her family, consisting of husband and two children—Dalla, a girl ten years old, and Earl, a boy of six. The defendant had been their family physician for twelve years. His age is not given, but the fact that he graduated at the Washington University Medical School in 1865 indicated that he had arrived at the age of discretion. Mrs. Wessel had suffered from an ovarian trouble for which Dr. Lavender had been treating her· It caused her much pain at times, and he had been called to relieve her, and on the particular occasion in question he was called for the same reason, and administered the usual sedative by hypodermic injection. What is charged to have occurred is stated in the petition as follows:

"That on the said 16th day of April plaintiff's husband was temporarily absent from his home and not expected to return for a period of about . . . days and the defendant knew that plaintiff's husband was so absent and was not expected to return for said period of . . . days; and so knowing, defendant being in the course of his treatment of plaintiff for her sickness in her bed room in the presence of said minor children, administered to and caused to be taken by plaintiff, under the belief, on the part of plaintiff, that the same was necessary for her proper treatment for said sickness, a dose of medicine. That defendant having administered said medicine, plaintiff being then and

there sick and in bed, under the influence of said medicine, became and was unconscious, and that shortly thereafter plaintiff regained consciousness and upon regaining consciousness, defendant, then plaintiff's physician as aforesaid, was in bed with plaintiff, engaged in the act of committing sexual intercourse upon the body and person of plaintiff; that at the time defendant was undressed and plaintiff's minor children were absent from the room; that at the time when plaintiff as aforesaid discovered defendant in said act of violating her person, she at once separated her person from that of defendant, and thereupon defendant left plaintiff's bed and put on his clothes and departed.''

On the trial the plaintiff testified in substance that on Monday evening April 13, 1908, she was suddenly seized with a painful aggravation of her trouble and called Dr. Lavender, who administered a hypodermic injection which relieved her. He also attended her the next day for the same purpose, but did not come Wednesday. On Thursday evening after retiring she was seized with a very painful attack and sent for Mrs. Struebe, a neighbor woman, and for Dr. Lavender. There was at the time, in addition to her own family, a young girl about fifteen years old staying in the house to assist her. She slept in a large room with two beds, one of which was occupied by this girl and her daughter, while the little son occupied the bed with her. Mrs. Struebe came and then the Doctor, who administered a hypodermic injection and sat by the bed to await its effect. It did not relieve her and he administered another. The two girls had, after the arrival of Mrs. Struebe, been sent to bed in a room across the hall and the boy had been placed in the other bed in Mrs. Wessel's room. Shortly after the administration of the two injections she became tired and went to sleep, the Doctor then being seated at the bedside and Mrs. Struebe at the foot of the bed. She

awoke with a smothering sensation, and found the Doctor in the bed engaged in the commission upon her of the act charged in the petition. She then said: "What in the dickens are you doing, doctor?" and called for her daughter. The Doctor said: "The kids aren't in here." She then called Mrs. Struebe and the Doctor said she had gone home. She said, "You get in the hall and call those kids out of there, you call them." He was then dressing and told her to be quiet, that it was not so bad. She asked him again to call the children. When he had completed his toilet he picked up his grip and she cried again two or three times to call the children, but he walked back into the kitchen and then returned to the bed and said: "Look here, Mrs. Wessel, now if you ain't quiet I will give you another dose of medicine." She then shut up mighty quick and kept still. He asked her how she was feeling and she said all right, and asked him again to call the children. He then went out and the two girls soon came into the room.

She further testified that the next morning the doctor called at her home, and coming into her room, shut the door and sat down near her bed. She asked him what made him do that to her the night before. He said it was not so bad, and not to make a great big halloo about it. After some talk in which he attempted to excuse himself, she called him "You dirty, nasty, stinking thing," and threatened to tell her husband. He tried with much talk to persuade her not to "make a great big howl about little or nothing," but she kept on fussing and he kept on arguing that it would ruin his reputation and that a murder might come of it. She insisted that she was going to tell Mr. Wessel, and after the fuss had lasted quite a while he said: "Well, I am willing to pay for the dirtiness and harm: it don't make any difference how much it will cost, if it costs me $1000, just so you won't tell him." She vowed and declared for a while that she would, and finally

said she would see about it.   He said: "All right,
Mrs. Wessel," and then after they had quarreled a
little longer he went home.   This talk lasted from half
past six or seven o'clock that morning until half past
eight or nine o'clock.   In the afternoon he came back
and after shutting the door asked her if she agreed to
it.   After they had argued a while, she said: "If you
are willing to pay what I ask you, I will agree to it,
to take the money."   He said: "All right, Mrs. Wes-
sel, are you honest?"   She said, "Yes, honest to God,"
and they shook hands on it and made the agreement
that he was to pay.   She was not to tell her husband
or anybody else.   This final conference took about an
hour.   No amount was mentioned other than stated
above.

Doctor Lavender testified that at the time of his
call on the night of April 16, 1908, he stayed until Mrs.
Wessel had gone to sleep after the administration of
the second hypodermic and then went home, and that
everything she testified to as having occurred after-
ward was purely fabrication, without any foundation
in fact, and that he never had heard of any complaint
of the kind until February 6, 1909, when she came to
him with a bill as follows:

"Marthasville, Mo., Feb. 4, 1909.

"To Dr. C. L. Lavender ................ $500
for taking the advantage of me Mrs. Wm. Wessel while
I was under the influence of medicine."

On this paper were written by Dr. Lavender the
following word and figures: "2-6-08.   Received $60."

Mrs. Wessel testified that when she made the bar-
gain with the doctor he said he could not pay her un-
til the first of the year, so that she waited until about
the middle of January before saying anything more to
him about it.   In the meantime she was making monthly
payments on the family doctor bill which he then told
her had nothing to do with her bill against him, which
he wanted her to make "reasonable."   This induced

her to make it $500 instead of $1000. On February 4, Mr. Wessel asked her to pay the balance of $57 still due on the family bill, which she did, taking her bill along, but had no opportunity to present it. She went back on the sixth, and when she presented it he said, "What are you going to do if I don't pay it?" They then quarreled, during which she asked him to call his wife ·and threatened to tell Mr. Wessel and that it would come out, and then started to go, when he caught her by the arm and after more talk paid her $60 and marked it on the bill as it appears.

The Doctor says that she first presented the bill on February 6th and that when he refused to pay it, she presented a gun, and in terms oozy with profanity and ribaldry commanded him to pay some of it. He was scared, thought his life in danger, and gathered up $60, the same bills she had paid him two days before, which he paid, marking it on the bill, which he put in his own pocket, where he kept it until he turned it over to his attorney. He had her arrested with due promptitude on the charge of robbery growing out of the manner in which she made the collection, and she brought this suit.

Dr. Lavender testified on the trial as to the kind and quantity of the medicine administered to Mrs. Wessel on the night of the alleged assault and introduced expert witnesses who testified that it would not ordinarily produce unconsciousness. The plaintiff requested and the court gave the jury the following instructions:.

"1. The court instructs the jury that if they believe from the evidence that defendant on the 16th day of April, 1908, was the physician of plaintiff and as such physician gave to plaintiff one or more hypodermic injections and that within a short time thereafter plaintiff, being in bed in her home and defendant being present as such physician in the same room with plaintiff, fell asleep and that thereupon defendant,

while plaintiff slept (if she did so sleep), without the knowledge of plaintiff, got in bed with plaintiff and had sexual intercourse with plaintiff against her will and without her consent—then the jury will find a verdict in this case for plaintiff, and will assess her actual damages at such sum not exceeding five thousand dollars as in the judgment of the jury will fairly compensate plaintiff for such distress of mind, shame, humiliation and wounded feelings as the jury may find plaintiff sustained by reason of such intercourse.

"3. The court instructs the jury that if they find from the evidence that defendant had sexual intercourse with plaintiff against her will and without her consent on the 16th day of April, 1908, at a time when defendant was in attendance upon plaintiff as her physician and plaintiff in bed and asleep and her husband absent from home and that at the time of such intercourse no other persons were on the premises with plaintiff and defendant, except plaintiff's son, aged about six years, and her daughter, aged about nine years, and a girl employed about the premises, aged about fifteen years, and that on the following morning defendant returned and plead with plaintiff to say nothing about such intercourse and proffered to pay plaintiff damages if she would say nothing about such intercourse and that plaintiff was thereby induced to keep silent about such intercourse, then plaintiff's failure to make complaint to other persons of such intercourse will not defeat plaintiff's right to recover damages in this action for such intercourse. But the jury should take these circumstances and all the other facts and circumstances in evidence in consideration in determining whether the defendant did or did not have carnal knowledge of plaintiff against her will and consent."

At the request of defendant he gave the following instructions:

"8. The burden of proof is upon the plaintiff to show by a preponderance, that is, by a greater weight of the testimony, to the reasonable satisfaction of the jury, that the defendant engaged in the act of committing sexual intercourse upon the body and person of plaintiff against her will and while she was unconscious as a result of medicine administered to her by defendant, and unless she has so shown by the greater weight, that is, by the preponderance of the testimony, you will find for defendant."

The verdict was for defendant.

I. The questions of fact in this case are simple, and it will assist us to reduce them to their lowest terms before proceeding to the examination of the questions of law predicated of them in this appeal. The wrong charged in the petition is that the defendant violated the plaintiff's person while she was unconscious. The answer is a general denial. Both parties testify that the defendant attended the plaintiff in his capacity of physician, at her request, at the time and place of the alleged commission of the wrong so charged, for the purpose of ministering to her in physical distress, and that he gave her remedies appropriate to her condition of suffering, and sat by her side until she slept. Up to this point their versions are in perfect accord, but here they diverge. He says that when she went to sleep he went away, leaving her in that comfortable condition. She says this is not true—that she was rudely awakened and found him engaged in perpetrating the outrage of which she complains, having already committed a capital felony. There are none of those questions of consent or resistance which are frequent features of such dramas. The sole question is upon the truth or falsity of these respective statements of the actors.

II. The defendant by his instruction number eight, raised the subordinate issue as to whether or

not the condition of unconsciousness which is admitted
to have supervened to her upon the ces-
sation of her pain was a result of medi-
cine administered to her by defendant.
He prepared the way by the introduction
of expert testimony to the effect that the
dose he said he administered would not
ordinarily have caused unconsciousness. This testi-
mony was not disputed; in fact, its effect could not be
contradicted, because the defendant alone of all the
world knew how much medicine he gave her. It is
plain that if the cause of her unconsciousness was not
in issue, but if the act charged was actually committed
while she was unconscious from natural sleep induced
by the cessation of her pain or otherwise, she was
equally entitled to recover under the pleadings, then
the giving of this instruction was highly prejudicial to
the plaintiff. This raises the important question of the
case.

The respondent does not contend that this limita-
tion upon the plaintiff's right to recover is correct as
an abstract proposition. He admits that the act with
which he is charged would be equally actionable had
the unconsciousness charged resulted from natural
sleep, as in State v. Welch, 191 Mo. 179, but he at-
tempts to justify the instruction on the ground that
the statement of the petition that the defendant ad-
ministered to plaintiff "a dose of medicine," and that
"having administered said medicine, plaintiff being
then and there sick and in bed, under the influence of
said medicine, became and was unconscious," implies,
if it does not state, that the unconsciousness was a
result of the medicine; and that it follows that there
can be no recovery unless the cause of her unconscious-
ness is proved as charged. Admitting his construction
of the petition, is respondent's conclusion correct?

The rule is that proof is only required of those
allegations necessary to a recovery, and that those un-

*[margin note:]* Ravishing Unconscious Female: Cause of Unconscious State not an Issue.

necessary to that end may be eliminated as surplusage. [Mehan v. St. Louis, 217 Mo. 35, 46; Frederick v. Allgaier, 88 Mo. 598, 603-4; Smith v. Fordyce, 190 Mo. 1.] The rule more specifically stated is that where a good cause of action is well stated in the pleading, all additional averments consistent therewith, whether by way of inducement, explanation or additional particulars, may be rejected as surplusage, and a recovery may·be had upon proof of the essential facts remaining. The only exception to this rule is that in those special cases when the law permits a recovery upon the statement of a legal conclusion, as upon the general allegation of negligence in a suit by a passenger against the carrier, if the plaintiff, instead of relying upon this right, undertakes to state the specific facts constituting his cause of action he will be held to have abandoned his general statement. This exception, it will be seen, is more apparent than real, for the pleading, so constructed and construed will then be subject to the rule we have stated. The allegation in this petition that the plaintiff was asleep is as clearly a statement of fact as would be the allegation that she was dead. While the cause of her slumber as well as the cause of her death might in a proper case become an important question for adjudication, it is not, as we have seen, important in this case. The giving of this instruction was prejudicial error.

III. The respondent says that the judgment ought to be permitted to stand because, underlying and controlling all other questions in the case is the fatal fact that the testimony of the plaintiff is of such a character that had the verdict and judgment been for the plaintiff, it ought not to be permitted to stand. He says that for that reason the case should not have been submitted to the jury.

Female's After-Agreement to Remain Silent: Her Testimony.

We are not usually disposed in such cases to attach much importance to the failure of a woman to vindicate her own virtue and the majesty of the law by raising the hue and cry to announce her shame and humiliation. We can understand how the natural modesty of a good woman may impel her to hide so foul a thing in her own soul, suffering the pain and humiliation alone, rather than to endure the mortification of displaying it in the arena the law has provided for such exhibitions, to curious crowds that in her outraged imagination would look upon her as polluted rather than wronged. This case, however, presents no such difficulty. According to her own relation of the affair the plaintiff, as soon as the matter was presented to her in that light, considered the financial features of the situation, with the result that she agreed, in consideration of money promised her by the one who had wronged her by the commission of a felony, to conceal the crime, and thereby herself became guilty of a felony. [R. S. 1909, sec. 4360.] When the money was not paid and he intimated that he did not intend to pay it, she said to him, "I am going to tell on you." This, she says, brought him to such a realizing sense of the trouble he was in that he followed her, and caught her by the arm in the door, and paid her the sixty dollars. She then wiped the tears from her eyes on her wrist and departed. The fact that Dr. Lavender, in charging her with robbery, founded his accusation upon a threat to shoot rather than a threat to accuse him of a felony, under section 1895, Revised Statutes 1809, may not be corroborative of his version of the affair as against hers, but it at least illustrates that queer perversity of human character which sometimes prefers pure invention to equally available facts. We know of no law which disqualifies Mrs. Wessel as a witness by reason of these circumstances, or prevents the jury from considering her testimony for what they may think it worth, but even

should it require corroboration, about which it is entirely unnecessary to express an opinion, it finds it in the fact that the Doctor paid sixty dollars on a fair statement of the ground on which this suit is founded, and took upon himself the burden of explaining it.

On the ground stated in discussing the defendant's eighth instruction we are constrained to reverse the judgment of the trial court, and to remand the cause for a new trial. *Blair, C.,* concurs.

PER CURIAM.—The foregoing opinion by BROWN, C., is adopted as the opinion of the court. All the judges concur, *Woodson, P. J.,* in result.